80 N.J. Super. 79 (1963)
192 A.2d 865
GLEN ROCK REALTY CO., A NEW JERSEY CORPORATION, ET AL., PLAINTIFFS-RESPONDENTS AND CROSS-APPELLANTS,
v.
BOARD OF ADJUSTMENT AND MAYOR AND COUNCIL OF THE BOROUGH OF GLEN ROCK, ET AL., DEFENDANTS-APPELLANTS AND CROSS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued May 20, 1963.
Decided July 3, 1963.
*81 Before Judges GOLDMANN, FREUND and FOLEY.
Mr. George Winne argued the cause for appellants and cross-respondents.
Mr. Marvin H. Gladstone argued the cause for respondents and cross-appellants (Mr. Walter H. Jones, attorney).
The opinion of the court was delivered by FOLEY, J.A.D.
Defendants-appellants and cross-respondents (borough) appeal from that part of a judgment of the Law Division granting plaintiffs-respondents' and cross-appellants' applications to the zoning board of adjustment for *82 its recommendation of a variance from the municipal zoning ordinance. N.J.S.A. 40:55-39(d). Those parties in turn cross-appeal from that part of the same judgment dismissing their demand for a declaration that certain parts of an amendatory ordinance adopted in 1953 are invalid.
The land concerning which the controversy arises is owned in part by the Estate of Cornelia Sikkema, and in part by William and Jennie Sikkema (Sikkema). Glen Rock Realty, Inc. (Realty) is a contract vendee of the land, execution of the contract being dependent upon a determination of the legality of the prospective use intended by the vendee.
The land, consisting of approximately 3.5 acres, is roughly in the shape of a trapezoid and constitutes almost all of a small triangular area pointing south and located between the Erie Railroad tracks and Lincoln Avenue, in the extreme southwesterly section of Glen Rock. On the easterly side the trapezoid is bordered by the main line of the railroad right-of-way for its entire length  510.07 feet. The railroad tracks separate the subject property from the only industrial zone in Glen Rock, and the property had been a part of such zone until the passage of the 1953 ordinance. The industrial zone has been extensively developed for the purposes of business and industry. The railroad tracks accommodate a daily schedule of 40 passenger trains and an undetermined number of freight trains.
The southern border, near the apex of the triangle, runs east and west for a distance of 155 feet between the railroad tracks and Lincoln Avenue. There are two small lots south of the southerly line. South of these lots and beyond Diamond Bridge on Lincoln Avenue are properties which are used for both business and residential purposes. This area lies in Fair Lawn and is zoned for commercial uses.
On the westerly side, the property fronts on Lincoln Avenue for a distance of 427.63 feet. Lincoln Avenue separates Glen Rock from Hawthorne and Bergen County from Passaic County. Fronting on the Hawthorne side of Lincoln Avenue and opposite to the subject property there is a short strip *83 which Hawthorne has zoned as a residence "B" district. It is occupied by several small frame bungalows in some of which there are conducted nonconforming businesses  landscape gardening, florist and plumbing. One block to the north along the Hawthorne side of Lincoln Avenue marks the beginning of a five-block strip zoned for business and used commercially.
The northerly line of the subject property runs east and west for 391.17 feet and parallels a street known as the Boulevard. On the southerly side of the Boulevard, adjacent to the property in question are several lots, some vacant and some used for residential purposes. The area north of the Boulevard on the Glen Rock side of Lincoln Avenue is zoned as an "A-2" residential district.
The property is level at grade but slopes sharply toward the railroad tracks and access to it is from Lincoln Avenue only.
For more than half a century the Sikkema family has used the property for a variety of business purposes as well as for residence. One portion of it is presently used by William Sikkema as a residence, and also for a well-drilling operation which requires the storage of large quantities of materials and equipment; the larger remaining portion lies vacant.
Under the Glen Rock zoning ordinance of 1929 the property was zoned for industry. This classification remained unchanged by a 1949 amendment. The ordinance was revised in 1953 and the property was rezoned and restricted to one-family residential uses. The constitutionality of this ordinance as it affects the Sikkema property is the determinative issue in the case.
It appears from the testimony of Allan B. Murray, defendant Mayor and, at the time of the 1953 rezoning, a member of the Borough Council, that William Sikkema and his attorney were present at the council meeting in 1953 when the revised ordinance was adopted. Sikkema and his counsel voiced their objections thereto at that time. The *84 then Mayor, Frank Demarest, stated, "any time that the Sikkemas come up with a use, a non-residential use, that the Council would be very happy to consider it and he indicated * * * that if everything was agreeable that a zoning change would be made." Mayor Murray observed that the attitude of the mayor and council at the time was that the property in question could hardly be considered a good residential area and that the purpose of the residential restriction was to allow the property to remain under the control of the planning board, the mayor and council, and the board of adjustment. The deposition of the late Mayor Demarest was introduced; it corroborates Mayor Murray's testimony.
Realty proposes to use the property for a retail shopping center. In a letter to Mayor Demarest, dated February 28, 1961, from D.J. van Keuran, Chairman of the Zoning Board of Adjustment, it appears that the board of adjustment met on February 27 to carry out the council's request that the board consider the proposed use of the Sikkema property for a retail shopping center. On the basis of the board's "personal observations" they were of the opinion that the proposed use would create traffic problems, enhance sanitary problems and "fragmentize our central business district without adding materially to the convenience of our citizens." (The central business district is located some distance to the northwest of the property in question, along Rock Road.) The board preferred more centralization of small business shops, specifically decrying "the dispersal of buying power into peripheral areas."
From the deposition of Mayor Demarest it appears that on or about June 10, 1961, defendants Mayor and council introduced an amendment to rezone the Sikkema property for commercial uses. The Glen Rock Chamber of Commerce intervened, as a result of which the proposed amendment was voted down on second reading.
On July 31, 1961 plaintiffs made application for the recommendation of a variance under N.J.S.A. 40:55-39(d). After a hearing in which the foregoing facts were developed, *85 the board denied plaintiffs' application and the present action in lieu of prerogative writs was instituted.
The hearing before the board also presented the following additional factual complex. Robert Catlin, a planner for the firm of Pangburn & Bagby, testified that his firm made studies and presented comprehensive plans prior to the 1953 amendment. The firm recommended that the property in question be changed from an industrial to a residential designation. In setting up the residence districts, the planners proposed the establishment of "Neighborhood Councils" as continuing agencies to allow the residents of a district to make their views known. The comprehensive map, however, leaves the property outside any "Neighborhood Council." Catlin stated it was a fair assumption that the property was left out because it was not intended for residential use, although he did not know this from personal knowledge.
Robert F. Edwards, the Director of Planning of Montclair, testified that in 1953 and to the present, the one-family restriction was the most inappropriate use of the property and that commercial use was the most appropriate.
Bernard J. Boreman, a real estate salesman who is handling the contingent sale between plaintiffs Sikkema and plaintiff Glen Rock Realty, Inc. admitted that six houses could be put on the property in question but said the houses could not be sold. He said that efforts had been made to sell the property for residential purposes but "nobody would even consider it."
Gerald F. Dederick, a real estate broker, agreed that the property was unsuitable for residential purposes, and stated that it was particularly suitable for a shopping center.
There was also evidence concerning the traffic situation. Abraham Simoff, plaintiffs' traffic expert, testified that Lincoln Avenue is presently used up to 67% of its safe capacity. A survey indicated that approximately 832 vehicles used the highway both ways between 3:00 and 6:00 P.M. The only traffic control is a 25 miles per hour sign. The proposed retail store development would have a parking capacity of *86 145 cars. It is estimated that there would be a turnover 6 times a day, or about 900 vehicles, approximately 10% of which would make ingress or egress on Lincoln Avenue during the peak traffic period. Simoff was of the opinion that the proposed use would not generate a condition of traffic congestion or hazard.
The first count of plaintiffs' complaint sought a declaration that the 1953 zoning ordinance as it pertained to plaintiffs' property was invalid, and an order directing defendant building inspector to issue necessary building permits. The second count sought vacation of defendant board's denial of plaintiffs' application for variance, and an order directing that the defendant grant the variance.
The case was decided in the Law Division upon the basis of exhibits and the stenographic record of the board of adjustment proceeding. The trial court found as a fact that the proofs, as above set out, plainly entitled plaintiffs to a variance from the one-family residence restriction, and thus that the action of the board of adjustment in refusing to recommend the variance was erroneous, arbitrary and unreasonable. If this were the only issue in the case we would unhesitatingly concur in the court's factual findings. Based on the extensive proofs in this case we find it beyond debate that the refusal to permit other than residential usage was so completely unrelated to substantial detriment to the public good and to the central purposes of zoning, as to be confiscatory of the Sikkema property rights. But in passing we note that the relief granted on the second count was too broad. The trial court expressly granted the application for a variance and directed the Building Inspector to issue a building permit. It is noted that the authority of the board is here limited by N.J.S.A. 40:55-39(d), supra, to a recommendation that a variance be granted. The order of the court should have gone no further than to direct that such recommendation be made. Cf. Mayer v. Bd. of Adjustment *87 of Town of Montclair, 56 N.J. Super. 296, 305 (App. Div. 1959), reversed on other grounds, 32 N.J. 130 (1960).
However, the case presents a more pervasive problem. We are satisfied that the trial court erred in rejecting plaintiffs' argument that the 1953 amendment was unconstitutional to the extent that it affected plaintiffs' property. Our reading of the court's opinion leads us to believe that the judge was probably of the view that the 1953 amendment which lifted the Sikkema property from its long established setting in an integrated industrial district was arbitrary and unreasonable, but, notwithstanding, the ordinance survived attack upon constitutional grounds because plaintiffs could seek relief from its restrictive effects by application for a variance. In this connection, the court said:
"* * * While the change of zone use of plaintiffs' premises from industrial to residential on adoption of the new master plan in 1953 may appear arbitrary and unreasonable and therefore constitutionally null and void as to plaintiffs' premises the validity of a zoning ordinance is not to be determined solely by its effect upon individual property. The flexibility of the zoning laws permit relief to such aggrieved individual owners by application to the board of adjustment for a variance. N.J.S.A. 40:55-39, Fischer v. Bedminster, 11 N.J. 194 (1952)."
Preliminarily, we point out that the reference to the holding in the Fischer case is inapposite. In Fischer the zoning ordinance by its terms was held to be a reasonable exercise of the police power conferred by the 1947 Constitution, Art. IV, § 6, par. 2, and implemented by the Zoning Act, N.J.S.A. 40:55-30 et seq. In such circumstances a property owner aggrieved by restrictions imposed by a valid zoning scheme may seek relief from the board of adjustment, N.J.S.A. 40:55-39. This is the very function the board of adjustment is designed to serve. But, this is not to say that if an ordinance provides unreasonable and arbitrary restrictions in the first instance and thus is unconstitutional, it gains constitutional status because the subordinate board in its discretion may possibly relieve the property owner in *88 limited degree from the effects of the unconstitutional enactment.
The board of adjustment is neither a crutch to support the sagging frame of an unconstitutional zoning ordinance nor a panacea for the cure of its fatal illness. The scope of the powers of the board is clearly defined, and such powers operate only in the context of a valid ordinance which unduly harasses a property owner without creating an overbalancing advantage in favor of the public welfare.
The reasonableness of a zoning ordinance must be tested in the setting or physical characteristics of the area in which it is sought to be enforced. Zampieri v. River Vale Tp., 29 N.J. 599, 606 (1959). The physical setting of this case negates the reasonableness of the 1953 ordinance as it applies to plaintiffs' property. Since 1929 the property had been zoned and used commercially, although members of the Sikkema family also resided on the property. The land bounds a heavily used railroad track which runs through the main industrial district of Glen Rock. On the other three sides of the property there are indeed some residences, but these, as we have said, are widely dotted with commercial nonconforming uses. A block to the north, on the Hawthorne side of Lincoln Avenue, are five blocks of commercial property, so zoned by Hawthorne, and to the south, across Diamond Bridge, is Fair Lawn's commercial zone.
Defendants argue that the railroad provides a "natural" boundary between industrial and residential districts. Passing over the adjectival misnomer, the railroad track may provide a line of division for aesthetic and geometrical appreciation of the maps, but it is of no aid in establishing the reasonableness of the zoning of the property in accordance with surrounding land uses.
Defendants stress the thesis that dwelling houses can be built upon the property; yet the evidence shows that such buildings are not economically feasible because it is highly improbable that anyone would purchase them.
*89 Nor is the traffic problem a blockade to the proposed commercial use of the property. The evidence of plaintiffs' experts pointed to an increase of traffic, but not beyond maximum safe capacity.
Finally, although defendants argue that the 1953 ordinance was in accordance with a comprehensive plan designed to effectuate one or more of the purposes enumerated in R.S. 40:55-32  lessen street congestion; secure safety from fire, panic and other dangers; promote general welfare; provide adequate light and air; prevent overcrowding of land or buildings; avoid undue concentration of population  the evidence is all to the contrary. Indeed, the testimony of Mayor Murray and the deposition of former Mayor Demarest clearly suggest the purpose of the town officials in enacting the 1953 ordinance. They wished to control the use of the property for nonresidential use such as they might later prescribe in light of the wishes of prevailing business groups in the community. That the ordinance was subsequently so employed is quite evident from the van Keuran letter. Zoning ordinances are to be assayed for motivation and purpose, in the context of local zoning history and the supposed need deemed relevant to the exercise of the zoning function. See Raskin v. Morristown, 21 N.J. 180, 184 (1956). Defendants readily concede that the protection of existing business interests in the community is not a valid zoning purpose.
While it may be true that the voluntary statements and unauthorized acts of its officials do not bind a municipality, State v. Giller, 5 N.J. Super. 130, 132 (App. Div. 1949), nevertheless extra-official statements of municipal officials have been considered in assaying the purpose of ordinances. Cf. Raskin, supra, 21 N.J., at p. 191. Compare also Nativo v. City of Hackensack, 76 N.J. Super. 512 (App. Div. 1962).
The role of the judiciary in reviewing zoning ordinances adopted pursuant to the statutory grant of power is narrow. The court cannot pass on the wisdom or unwisdom of an ordinance but may act only if the presumption in favor of the validity of the ordinance is overcome by an affirmative *90 showing that it is unreasonable and arbitrary. Vickers v. Tp. Com. of Gloucester Tp., 37 N.J. 232, 242 (1962). We are convinced that plaintiffs have carried this burden.
We conclude that the trial court's well taken criticism of the refusal of the board of adjustment to recommend a variance should have been applied with like effect to the ordinance itself. We would add thereto disapproval of the idea that although future residential usage was not envisioned the future use could be left in limbo and residential use prescribed only to serve this purpose. This does not accord with either comprehensive planning or a fair resolution of the competing interests of the property owner and the public.
Accordingly, the 1953 ordinance is declared unconstitutional to the extent that it affects the Sikkema property.
Reversed and remanded for the entry of a judgment not inconsistent with this opinion. Costs to plaintiffs.